# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| KATHY BANTA,<br><br>    Plaintiff,<br><br>vs.<br><br>OS RESTAURANT SERVICES, INC.,<br>a Delaware Corporation; and OUTBACK<br>STEAKHOUSE OF FLORIDA, INC.,<br>a Florida corporation;<br><br>    Defendants. | No. C07-4041-PAZ<br><br>**MEMORANDUM OPINION AND<br>ORDER ON DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT** |

_____

   This is a hostile work environment and retaliation case filed by the plaintiff Kathy Banta against the defendants OS Restaurant Services, Inc. and Outback Steakhouse of Florida, Inc. On August 15, 2004, the defendants filed a motion for summary judgment, supporting brief, statement of material facts, and appendix. On September 19, 2008, Banta filed a resistance to the motion, brief in support of resistance, response to defendants' statement of material facts, statement of additional material facts, and appendix. On October 1, 2008, the defendants filed a reply brief and supplemental appendix. The court heard telephonic oral arguments on the motion on November 21, 2008. Banta was represented by Jay E. Denne, and the defendants were represented by Kerrie M. Murphy, Karin R. Zeigler, and Emery King Harlan.

   The court has considered the parties' submissions and arguments carefully, and turns now to the issues raised by the defendants in their motion.

## I.  INTRODUCTION

OSI Restaurant Partners, Inc. ("Restaurant Partners") is the parent company of several individual restaurant companies, including the defendant Outback Steakhouse of Florida, Inc. ("Outback Florida").  The defendant OS Restaurant Services, Inc. ("OSRS") is a subsidiary of Restaurant Partners.  OSRS is in the business of leasing employees to Restaurant Partners' subsidiary restaurant companies.  Banta was employed by OSRS to work as a food server at the Sioux City, Iowa, Outback restaurant beginning on April 4, 2004, and continuing until January 29, 2006, when her employment was terminated.

On May 26, 2007, Banta commenced this action by filing a Complaint in this court.  In Count 1, Banta claims the defendants required her "to work in a hostile and pervasive atmosphere of racial discrimination and harassment."  In Count 2, she claims that after she complained about the hostile work environment and racial discrimination, she was singled out and subjected to increased and undeserved criticism and restrictions, and then was terminated from her employment.  In Count 3, she asserts Iowa state law claims of racial discrimination, racially hostile work environment, and unlawful retaliation.[1]  She asks for compensatory and punitive damages.  The defendants deny all of Banta's claims and her request for damages.  Prior to filing this action, Banta filed a timely "Complaint of Discrimination" with the Iowa Civil Rights Commission ("ICRC"), and was issued a "Notice of Right to Sue" by the ICRC and the Equal Employment Opportunity Commission.

In the pending motion, the defendants argue they are entitled to summary judgment on all of Banta's claims.  Banta responds that her claims present genuine issues of fact for trial.

---

[1]The court will apply the same legal standards to the federal and state law claims.  "It is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the [Iowa Civil Rights Act]." *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1177-78 (N.D. Iowa 2003).

Banta is part African American.  On Christmas Eve, December 24, 2005, she was in the bathroom at work when she heard someone loudly yell the word "nigger."  She recognized the voice as belonging to Tony Cote ("Tony"), who worked in the kitchen.  She opened the door and saw Tony, who smiled at her.  A few minutes later, she heard Ricky Cote call someone an obscene name that Banta perceived to be a racially-biased remark.

Banta complained about these remarks to James Brown ("Brown"), the manager of the Sioux City, Iowa, Outback restaurant, and then to Chris Liston, the kitchen manager.  Liston looked into the matter by asking Tony and two other members of the kitchen staff if they knew who had yelled the word "nigger."  Tony blamed Miguel, another member of the kitchen staff.  Miguel denied knowledge of the incident.  A third staff member, Ricky Cote (Tony's brother), blamed Tony.  Liston told all three that the use of this word would result in their being fired.  Liston then reported what he had done about the incident to James Brown ("Brown").

Brown took no action that day, and did not return to the restaurant until December 28, 2005, when he found an envelope containing a typewritten statement from Banta.  In the statement, Banta described what had happened on December 24, and stated that the day before the incident, she had complained to Brown about Tony and Ricky using inappropriate and abusive language.  According to Banta, right after the incident, she told Brown "it had better not happen again," and Brown responded that he did not want her to think he was ignoring her complaints.  Later, Banta told Liston that this was not the first time Tony had used this language, and she thought Tony should be fired.  According to Banta, Liston responded that Tony was an asset to the company, and he asked Banta to be patient.

On December 28, 2005, Brown and Liston met with the entire kitchen staff and reviewed the restaurant's discrimination and anti-harassment policies.  Brown told the staff

that offensive comments and harassment would not be tolerated. He also told the staff they were prohibited from playing music on the kitchen jukebox that contained racially offensive lyrics. After the meeting, Banta complained to Brown about Tony's not having been disciplined for the December 24 incident. On December 29, she sent an email to Outback Florida's corporate management, asking "to speak to someone about another employee [who] continually uses racist language." She also stated that other employees had voiced similar complaints to management.

On or about December 31, 2005, Tony called Banta a "black bitch." Banta reported this incident to Liston, and then met with Brown and Liston to discuss Tony's attitude and performance. On January 2, 2006, the defendants terminated Tony's employment.[2]

On January 5, 2006, William Robert Donovan, Jr., a corporate attorney employed by Restaurant Partners, responded to Banta's email, telling her he would like to discuss the matter with her and obtain more information. On January 6, 2006, Donovan talked about the situation with Joseph Nuzzolillo, an Outback Florida regional manager. Nuzzolillo was responsible for selecting, training, and supervising managers and supervisory staff at Outback restaurants in his region, which included the Sioux City Outback restaurant. Donovan asked Nuzzolillo to travel to Sioux City to conduct an investigation.

Before Nuzzolillo arrived in Sioux City, Banta was involved in at least three conflicts with Crystal Ferdig, the restaurant's assistant manager. First, Ferdig criticized Banta for the way she was putting ice into glasses. Next, Ferdig told Banta to move her car because she had parked in an area reserved for customers. The third incident occurred on January 15, 2006, when Banta left the restaurant without paying for some food she had

---

[2]In considering the promptness of management's response to these events, it arguably is significant that these events occurred over the Christmas and New Year's holidays.

eaten. This apparently was a fairly common occurrence for employees at the restaurant, but Ferdig brought this to Brown's attention, and he called Banta at home and asked her to pay the food ticket when she came in for her next shift. Instead, Banta returned to the restaurant immediately and paid the ticket. When she paid the ticket, she commented to another employee, "I'm getting really tired of how they've been treating me [since the incident with Tony]." Banta was not disciplined for any of these incidents, but she cites them as examples of her being singled out.

On January 17, 2006, Nuzzolillo conducted an investigation at the Sioux City Outback restaurant, and then met with Banta. The parties dispute what was said at the meeting. Nuzzolillo claims Banta told him things were much better. Banta claims she told Nuzzolillo she was glad Tony was gone, but she felt she had been treated differently since her complaint.

During Nuzzolillo's visit to Sioux City, he directed Brown "to require every server to perform a mandatory 'menu presentation' at the end of their shift." Nuzzolillo describes this directive as follows:

> During my January 17, 2006 visit to the Sioux City Restaurant, but not in any way a result of speaking to anyone regarding to Ms. Banta, I directed Mr. Brown to require every server to perform a "menu presentation" at the end of their shift before "checking out," hoping that practicing the "menu presentation" would improve guest service. This was commenced at all the restaurants in my region.

Def. App. 232, ¶ 12. Banta admits that all of the servers were required to do menu presentations, but she denies she was told the menu presentations were mandatory or that she knew her employment could be terminated for failing to do them. *See* Pl. App. 101-23, ¶ 4.

On or about January 20, 2006, Brown began to require servers to perform menu presentations at the end of their shifts. Banta completed at least one of these presentations

without incident. On January 28, 2006, Brown asked Banta to do a menu presentation at the end of her shift, and Banta replied that she was missing some money from her shift and wanted to track it down before doing anything else. She also stated she was sick. After some discussion, Banta refused to give the presentation. Brown told Banta that if she did not do the presentation that evening, she would be required to do it before her next shift. Banta arrived at work on January 29, 2006, and Brown asked her to do the menu presentation. Banta refused. At the end of her shift, Brown again asked her to do the menu presentation, and she responded, "No." A short time later, Brown terminated Banta's employment, stating he was doing so because she had refused to do the menu presentation.

In contemporaneous notes, Banta describes her termination as follows:

> January 28, 2006
> 10:30pm
>
> This evening when I asked Jim Brown for a server's report in order to do my bag I was told I wouldn't get one until I gave him a table presentation. I explained to Jim that there was an error in my totals and I really needed the report to figure out what I did wrong. . . . Jim said it would only take a minute and a half and I had to do the presentation before he would give me a report. I told Jim I wasn't willing to do it. . . . Jim explained again that all servers had to do this, not just me. I flatly refused. . . . The three of us [Banta, Brown, and Ferdig] went into the office, Jim again stated I would have to do the presentation in order to get my reading and wanted to know why I didn't want to do it. For the third time, I told him my reasons. I added that I found these rules to be ridiculous. . . . Jim said, "So . . . you're just not going to do it." I said no.
>
>         * * *
>
> Sunday, January 29, 2006
>
> Upon arriving for my shift at Outback at 11:30 a.m. Jim pulled me aside and stated once again that the table

presentation would not be optional and if I refused to do it again that I was saying I no longer wanted to work for Outback and that essentially I was quitting. I told Jim I found this very offensive . . . when he had an employee that not only was a poor worker but used racist language daily for 8 months he took over a week to decide what, if any, disciplinary action to take. But with me it took just one night to decide I should be punished. I told him that was an insult, and if he wanted to fire me over this issue to go ahead, otherwise I had to get to work to get the restaurant opened.

Jim said we still needed to talk about this, so . . . we sat down and discussed the matter further. Jim said he felt like I was just looking for a reason to "defy" him, I asked him when he's ever asked me to do something when I told him no, he admitted that that's never happened, that I've always gone above and beyond when I'm at work. That's why he was so surprised about the current situation. I asked him if that didn't give some sort of indication that there might be a problem. I again pointed out the double standard between him dealing with me and the way he dealt with Tony. Jim said the situation with Tony had nothing to do with what we were talking about. I told him it had everything to do with it.

At this point the restaurant was starting to get patrons so we ended the meeting there. When I was calculating my bag at the end of my shift Jim approached me and said, "are you going to do a presentation or not?" I said no. He asked me to step outside for a moment and told me that he was going to cover my shifts. I asked him what that meant. He said I wouldn't need to come back. I said, "So this means what?" He said he was letting me go. I asked him to repeat that in front of a witness. In front of Crystal and Brad Jim stated I was being let go because I refused to do a table presentation that day.

Pl. App. at 108, 111-12.

At all relevant times, the defendants had in place a Sexual Harassment Policy, an Equal Employment Opportunity Policy, an Employee-At-Will Policy, and an Employee Handbook. These documents were reviewed with each new hire.

## II. STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment, and provides that any party to a lawsuit may move for summary judgment. Fed. R. Civ. P. 56. Rule 56 states that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed. R. Civ. P. 56(c) (emphasis added).

In *Wright v. Winnebago Industries, Inc.*, 551 F. Supp. 2d 836 (N.D. Iowa 2008), Judge Mark W. Bennett explained summary judgment procedures in employment discrimination cases:

> Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S. Ct. 1955, 1982, 167 L. Ed. 2d 929 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. Fed. R. Civ. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is material when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505, does not make an issue of material fact genuine.

Thus, a genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49, 106 S. Ct. 2505. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id*. at 249, 106 S. Ct. 2505. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*.

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials negating the opponent's claim," *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323, 106 S. Ct. 2548 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving

party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322, 106 S. Ct. 2548; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88, 106 S. Ct. 1348; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88, 106 S. Ct. 1348. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S.

at 252, 106 S. Ct. 2505 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

The court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); see *Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases. . . ."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be used in employment discrimination cases."). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence. . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (en banc ) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*, 425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). Nonetheless, this exercise of

judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). . . .

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." *Oliver Wendell Holmes, The Common Law* 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today - more than forty years after the passage of Title VII which is at issue here - than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g.*, *Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir.

1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). This court's experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers - equally protected by Title VII, the ADA, the ADEA, or the FMLA - for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

*Wright v. Winnebago Industries, Inc.*, 551 F. Supp. 2d at 841-845.

Keeping these standards in mind, the court now will address the issues raised in the defendants' motion for summary judgment.

## III. LEGAL ANALYSIS

### A. Absence of Employer/Employee Relationship; Failure to Exhaust

Outback Florida argues Banta was employed by OSRS and not by Outback Florida, and therefore Outback Florida is entitled to summary judgment on all of Banta's claims against it. In a related argument, OSRS argues that because Banta's ICRC Complaint of Discrimination did not name OSRS as a respondent, she has failed to exhaust her administrative remedies, so the court also should dismiss Banta's claims against OSRS.

In support of these arguments, the defendants recite the following in their statement of undisputed facts:

> 1.      OSI Restaurant Partners, Inc. is the parent company of several individual restaurant "concepts" (i.e. Bonefish Grill, Outback Steakhouse and Cheeseburger in Paradise).
>
> 2.      Defendant Outback Steakhouse of Florida, Inc. (hereinafter "**Outback Steakhouse**") is a subsidiary of OSI Restaurant Partners, Inc. and a general partner of Defendant OS Restaurant Services, Inc. (hereinafter "**OS Restaurant Services**").
>
> 3.      OS Restaurant Services is in the business of leasing its employees to several of the restaurant concepts within OSI Restaurant Partners, Inc. organization, including Outback Steakhouse.
>
> 4.      On April 4, 2004, OS Restaurant Services, Inc., (hereinafter "**OS Restaurant**") hired Plaintiff Kathy Banta (hereinafter "**Ms. Banta**") to work as a food server for the Sioux City Outback Steakhouse Restaurant located in Sioux City, Iowa (hereinafter "**Sioux City Restaurant**").
>
> 5.      Ms. Banta only received paychecks from OS Restaurant Services for her work at the Sioux City Restaurant.
>
> 6.      Ms. Banta filed her annual taxes with W-2s issued by OS Restaurant Services.
>
> 7.      Ms. Banta has never filed her annual taxes with any W-2s issued by Outback Steakhouse.

Doc. No. 37-4, ¶¶ 1-7 (citations omitted).

Banta did not object to any of these facts, so the court will treat them as having been admitted. LR 56(b). However, the precise relationship between the entities referred to in these "facts" is not easily understood,[3] so the court will refer to the summary judgment

---

[3]For example, in paragraph 2 of the statement of undisputed facts, the defendants state that Outback
(continued...)

record for clarity. Most of these "facts" were taken from the deposition of William Donovan, a corporate attorney employed by Restaurant Partners, so the court will look there first for understanding, although Donovan himself testified he was not certain of the exact relationship between these entities. *See* Def. App. at 33-34.

It appears Restaurant Partners is an umbrella corporation that owns several restaurant companies, including Outback Florida. Outback Florida is general partner in several partnerships that own and operate Outback restaurants. One of these partnerships owns and operates the Outback restaurant in Sioux City. OSRS is a subsidiary of Outback Florida, and leases employees to Outback Florida in exchange for a fee. Def. App. at 33. When Banta worked as a server at the Outback restaurant in Sioux City, she technically was an employee of OSRS, but was leased to Outback Florida to work at the Sioux City Outback restaurant. Banta received her paychecks and W-2 forms from OSRS, but the policies and procedures applicable to her employment all originated from Outback Florida.

At all times relevant to this case, James Brown was employed by OSRS to be the manager of the Sioux City, Iowa, Outback restaurant. He also was a limited partner in the partnership that operated the Sioux City Outback restaurant (Outback Florida was the general partner). Joseph Nuzzolillo was employed by Outback Florida as a regional manager, and was responsible for selecting, training, and supervising managers and supervisory staff at Outback restaurants in his region. The Sioux City Outback restaurant was in his region. He also was a limited partner (or "Joint Venture Partner") in the partnership that operated the Sioux City Outback restaurant. William Donovan worked in the office of the general counsel for Restaurant Partners, and apparently for all of the related entities, including Outback Florida and OSRS. Def. App. at 34. Nuzzolillo and

³(...continued)
Florida "is a subsidiary of Restaurant Partners, Inc. and a general partner of Defendant OS Restaurant Services, Inc." The defendants do not explain how Restaurant Partners can be a general partner in a corporation.

Donovan both were involved in investigating Banta's complaints of a racially hostile work environment and retaliation.

Outback Florida argues that before Banta can assert claims of discrimination or retaliation against it, she initially must establish that Outback Florida was her employer. Outback Florida argues the undisputed facts are that Banta never was an employee of Outback Florida. Banta responds that, for purposes of her claims here, she was, in fact, an employee of Outback Florida.

The record establishes that Banta had an employment contract with OSRS, but she actually worked for an unidentified partnership that operated the Sioux City Outback restaurant. Outback Florida was the general partner in the partnership. Brown, the restaurant manager, was an employee of OSRS, but also was a limited partner in the restaurant partnership. Brown was supervised by Nuzzolillo, an employee of Restaurant Partners and Outback Florida, but also a limited partner in the Sioux City Outback restaurant partnership. Donovan was an employee of Restaurant Partners, but worked for Outback Florida, OSRS, and the restaurant partnerships, including the partnership that operated the Sioux City Outback restaurant. Banta's claims of a racially hostile work environment and retaliation were handled first by Donovan, and then by Nuzzolillo. The handbooks and procedures governing the operation of the Sioux City Outback restaurant all were issued by Outback Florida.

Under these facts, the court finds that Banta was an employee of both OSRS and Outback Florida. This is not a situation where an employee is making claims against an employer's parent company simply to drag another party into the case. *See Brown v. Fred's, Inc.*, 494 F.3d 736, 739 (8th Cir. 2007). Here, the relationships between the various involved entities are almost perversely convoluted. Nuzzolillo was an Outback Florida regional manager, and was responsible for the overall supervision of Outback restaurants in his region, which included the Sioux City Outback restaurant. As part of

his duties, he selected management personnel and trained supervisors and managers for restaurants in his region. This included training on harassment, discrimination, and retaliation policies issued by Outback Florida. All new members of management at the restaurant level were required to attend several days of training on harassment, discrimination, retaliation, diversity, and inclusion, at Outback Florida corporate headquarters. Nuzzolillo and Donovan were both employed by Outback Florida, and both were significantly involved in responding to Banta's complaints.

Outback Florida dominated the Sioux City Outback restaurant's operations, *see Johnson v. Flowers Industries, Inc.*, 814 F.2d 978, 981 (4th Cir. 1987), and participated in the restaurant's individual employment decisions, *see Leichihman v. Pickwick International*, 814 F.2d 1263, 1268 (8th Cir. 1987), particularly decisions concerning the appropriate response to Banta's complaints. The court concludes Banta was an employee of both Outback Florida and OSRS, and that Outback Florida is a proper party in this case. To hold otherwise would be an absurd application of form over substance. *Cf. Serapion v. Martinez*, 119 F.3d 982, 988 (1st Cir. 1997) ("After all, form should not be permitted to triumph over substance when important civil rights are at stake.").

Similarly, the court is unpersuaded by OSRS's argument that Banta failed to exhaust her administrative remedies because her ICRC Complaint of Discrimination did not name OSRS as a respondent. Banta filed her Complaint of Discrimination against "Outback Steakhouse," not "OS Restaurant Services, Inc.," "Outback Steakhouse of Florida, Inc.," or "OSI Restaurant Partners, Inc." In the first paragraph of the response to the complaint, the following is stated: "Non-management employees of the subject restaurant are employed by OS Restaurant Services, Inc. This entity is a subsidiary of Outback Steakhouse, Inc." From this, it appears OSRS actually participated in responding to the complaint. In light of this fact, and considering the extensive interrelationships between

the Outback entities, the court concludes OSRS was effectively named in the ICRC complaint.

The defendants' motion for summary judgment on these grounds is **denied**.


## B. Claim of Racially Hostile Work Environment

Banta claims the defendants discriminated against her by creating a racially hostile work environment at the Sioux City Outback restaurant. She claims the defendants did this by permitting her co-employees to harass her based on her race.

To establish a *prima facie* hostile work environment claim for co-worker harassment, Banta must prove:

> (1) she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008). For purposes of summary judgment, there is no serious dispute that the first three requirements have been met, so the court will address only the last two requirements.

To establish that the harassment affected a term, condition, or privilege of her employment, Banta must "show the harassment to have been 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment' as viewed objectively by a reasonable person." *O'Brien v. Dept. of Agriculture*, 532 F.3d 805, 809 (8th Cir. 2008) (quoting *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007), in turn quoting *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003)). "Hostile work environment claims are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007). In evaluating these claims, the court is to consider the frequency of the alleged harassment; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance. *O'Brien*, 532 F.3d at 809 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993), and *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006)). To support a hostile work environment claim, the objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998)

The court must determine whether the facts summarized above, viewed in the light most favorable to Banta, meet these requirements. Banta worked at the Sioux City Outback restaurant for more than a year-and-a-half without serious incident. On December 24, 2005, she heard a kitchen staff member, Tony, use the word "nigger" in the workplace. A few minutes later she heard Tony's brother, Ricky, call someone an obscene name that Banta perceived to be racially insensitive. She complained about this to restaurant management. That evening, the kitchen manager met with the kitchen staff, told them not to use this type of language, and threatened to fire anyone who did. On December 28, 2005, the restaurant manager and the kitchen manager met with the kitchen staff and talked with them about the restaurant's discrimination and anti-harassment policies. Banta was not satisfied with this response, and on December 29, 2005, she communicated her concerns to corporate management in an email. On December 31, 2005, before corporate management had had a reasonable opportunity to respond to her

email, Tony called Banta a "black bitch."[4]  Tony was fired two days later, on January 2, 2006.  Banta does not allege any racially hostile activities by co-workers after Tony was fired.

Banta argues that these facts, when viewed together with other evidence in the record, satisfy her burden of proof for summary judgment purposes.  Because the court must consider the totality of the circumstances, *see O'Brien*, 532 F.3d at 809 ("Hostile work environment claims are assessed based on the totality of the circumstances"), the court will consider the other evidence submitted by Banta, but only to the extent it constitutes admissible evidence.  Hearsay statements ordinarily cannot be used to defeat or support a motion for summary judgment.  *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir. 2001); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993); *Walker v. Wayne County, Iowa*, 850 F.2d 433, 434-35 (8th Cir. 1988).  *See also Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) ("[A] party may not rely on inadmissible hearsay in opposing a motion for summary judgment.").  However, hearsay statements may be relied upon if they are not offered for the truth of the matter asserted, but to show the plaintiff's state of mind and her perception of the allegedly hostile environment.  *See Carter v. Chrysler Corp.*, 173 F.3d 693, 701 n.7 (8th Cir. 1999) (plaintiff's knowledge of offensive graffiti, gained through hearsay, was admissible on questions of whether hostile work environment existed and whether plaintiff reasonably perceived other conduct to be abusive or hostile) (citing *Schwapp v. Town of Avon*, 118

---

[4]From the record, this appears to be the only racially offensive remark actually directed at Banta at any time during her employment at the restaurant.  For example, Tony's Christmas Eve remark was a stray remark that Banta overheard from another room.  *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 760 (8th Cir. 2004) (distinguishing stray remarks from remarks directed at the plaintiff); *but see Madison v. IBP, Inc.*, 257 F.3d 780, 793 (8th Cir.2001) ("Here, Madison introduced evidence that other women and African American employees were also discriminated against and harassed. This evidence was relevant as to whether IBP maintained a hostile work environment, whether it intended to harass and discriminate against women and African Americans, and whether IBP's justifications for its refusal to discipline Madison's harassers or to promote her were pretextual.").

F.3d 106, 111-12 (2d Cir. 1997), where the court allowed evidence of racially-derogatory comments made outside plaintiff's presence).

Banta testified that beginning about a year before she was terminated, employees at the restaurant began routinely saying the phrase "fa shizzle ma nizzle."[5] According to Banta, "nizzle" is slang for "nigger." She testified, "I would just ask them to stop saying it. Most of them didn't know what it meant, but some of them even, when they found out, were still saying it, and [Brown's] response was, 'I don't know what to tell you. The Dave Chappelle show has kind of made that okay to say that word now,' and I told him, 'No, it hasn't. That needs to stop.'" Def. App. at 9. Brown took no action to stop the use of this phrase by restaurant employees.

Banta claims several of her co-employees told her that Tony Cote routinely used racially derogatory language and displayed racist attitudes in the workplace. In November 2005, she confronted Tony "and asked him what his problem was with bi-racial people. He yelled that he 'didn't believe in that shit,' meaning mixed race relationships." Pl. App. at 103, ¶ 9. In addition, Banta testified she personally had heard the word "nigger" in the restaurant "once or twice" before the December 24, 2005, incident. On one occasion in December 2005, she was talking with a co-employee who was complaining about Tony, and Tony overheard the conversation. Tony became upset, and Banta "thought" she overheard Tony use the word "nigger." She also heard Tony use the word on one other occasion, also in December 2005, during a discussion about the execution of the leader of the Crips gang. Banta has submitted to the court a typewritten statement dated December 28, 2005, from CeCe Patton, a co-worker and friend.[6] In this document, Patton states she overheard Tony use the word "nigger" on December 14, 2005, in

---

[5] According to the *Urban Dictionary,* the phrase is slang for "for sure, my nigger," which means "I concur with you whole heartedly, my African American brother."

[6] Banta actually typed the statement for Patton. December 28, 2005, was Patton's last day working at the Outback restaurant.

connection with execution of the leader of the Crips gang. Patton states she told management about the incident, but nothing was done about it. *See* Def. App. at 102.

The authorities cited by Banta lend limited support her argument that she was working in a racially hostile work environment. In *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906 (8th Cir. 2003), the plaintiff offered evidence of five incidents involving racial hostility that occurred over the course of several months. In reversing the district court's grant of summary judgment, the appeals court held that although it was a "close case," the case was submissible because these incidents included "a death threat aimed directly and specifically at the plaintiff." *Id.*, 333 F.3d at 909. The court distinguished *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839 (8th Cir. 2002), where the court held that "a plaintiff's claim of hostile work environment was not submissible where there was evidence that the plaintiff was the target of several racial epithets, that a poem with racist messages was circulated among the plant employees, and that drawings of 'KKK,' a swastika, and a hooded figure appeared on the walls of the men's restrooms," because there had been no specific death threat against him. *Reedy*, 233 F.3d at 909 (quoting *Woodland*, 302 F.3d at 843-44). In another case relied on by Banta, *Carter v. Chrysler Corp.*, 173 F.3d 693 (8th Cir. 1999), the appeals court reversed the district court's grant of summary judgment for the defendant based on the following facts:

> Carter has produced evidence that she experienced a host of indignities over the course of some two years. She regularly suffered verbal abuse interlaced with sexual and racial epithets. Rude sexual gestures were frequently made towards her, sexual insults were written on the walls of the company restroom, and acts of vandalism occurred in her work area. A picture of a naked man, dead animals, threatening notes, foul-smelling material, and debris were directed at her area. This altered her daily work environment, and she has shown that this conduct caused humiliation and intimidation, that it occurred in the presence of her co-workers, and that the source

of much of the problem was someone who worked in very close proximity to her on the assembly line.

*Id.*, 173 F.3d at 702.

The facts in the present case do not approach the types of environments endured by the plaintiffs in *Reedy* or *Carter*. Nevertheless, Banta has offered evidence that in addition to hearing occasional racial epithets herself, other employees talked to her somewhat frequently about racial slurs by Banta's co-workers. Reasonable minds could find that these facts created the perception of a racially hostile work environment in Banta's mind. Given the disinclination of courts to grant summary judgment in these types of cases, it cannot be said, as a matter of law, that the plaintiff's work environment "was not negatively impacted by [Tony's] comments." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000). Considering the totality of the circumstances, the court finds the record is just barely adequate to defeat summary judgment on this claim.

The court next must address the fifth step of the analysis; i.e., whether the defendants knew or should have known of the situation and failed to take prompt and effective remedial action. Before the Christmas Eve incident, Banta had complained twice to Brown, the restaurant manager, about racially insensitive utterances in the workplace by her co-employees. First, she complained that some of the restaurant's employees were using a cryptic slang phrase in the workplace, "fa shizzle ma nizzle," the meaning of which was unclear to at least some of the restaurant's employees. Banta informed Brown of what the phrase meant, and stated she found the phrase to be offensive. Second, on December 23, 2005, Banta told Brown that Tony was making racially offensive utterances in the workplace. Management did not respond to these complaints.

On Christmas Eve 2004, matters escalated when Banta heard Tony Cote use the word "nigger" outside the bathroom, and then his brother used an obscene epithet. Banta complained to the kitchen manager, Chris Liston, and Liston met with his staff about the incident. On December 26, 2005, Banta submitted a written complaint about the incident,

which was received by Brown on December 28, 2005. Brown responded immediately to the written complaint by having another staff meeting. On December 29, 2005, Banta sent an email to the defendants' corporate offices complaining further about the incident.

On these facts, the court cannot say, as a matter of law, that the defendants took prompt and effective remedial action in response to Banta's complaints. Banta had been complaining about racial hostility in the workplace for about a year. After the incident on Christmas Eve, 2005, she was required to continue working with Tony, even though there was strong evidence of his racial hostility. On December 29, 2005, Tony called Banta a "black bitch," but he still was not fired until two days later, on January 2, 2006.

In *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006), the court held, "In determining whether the employer failed to take 'prompt and effective remedial action to end the harassment,' [the court] consider[s] 'the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment.'" The court cannot say, as a matter of law, that the defendants took prompt and effective remedial action in response to Banta's complaints of a racially hostile work environment. *See Carter,* 173 F.3d at 703 (promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve).

The defendants' motion for summary judgment on this claim is **denied**.


### C. Banta's Retaliatory Discharge Claim

Banta claims the defendants retaliated against her for complaining of a racially hostile work environment at the restaurant. In *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707 (8th Cir. 2000), the court explained the requirements for a *prima facie* case of retaliation, as follows:

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate against an employee, for among other things, "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." In the absence of direct evidence of discrimination, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies to claims of retaliation. *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980); *see also Cobb v. Anheuser Busch, Inc.*, 793 F. Supp. 1457, 1489 (E.D. Mo. 1990). Under the burden-shifting analysis, the plaintiff must first establish a *prima facie* case of retaliatory discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. To establish a *prima facie* case of retaliatory discrimination, a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. . . .

Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the adverse action. *See Womack*, 619 F.2d at 1296. If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for retaliation. *See id*. Ultimately, the plaintiff must establish the employer's adverse action was based on intentional discrimination. *See Ryther v. KARE 11*, 108 F.3d 832, 837-38 (8th Cir. 1997) (en banc) (applying the *McDonnell Douglas* burden shifting analysis in an age discrimination case).

*Buettner*, 216 F.3d at 713-14.

The court finds Banta has made the requisite showing for a *prima facie* case under the *McDonnell Douglas* burden-shifting analysis. She was engaged in protected activity when she complained of an allegedly racially hostile work environment. An adverse employment action occurred on January 29, 2006, when her employment was terminated. The court also finds Banta has offered marginally sufficient evidence of a causal

relationship between her complaint of discrimination and the termination of her employment.  In response to the plaintiff's *prima facie* case, the defendants have produced evidence of a legitimate, non-discriminatory reason for terminating Banta's employment; that is, evidence that she was insubordinate to the restaurant manager when she repeatedly refused to perform a "menu presentation" as directed by him.  Thus, to avoid summary judgment on this claim, Banta must prove the proffered reason for her termination was a pretext.

Ultimately, to avoid summary judgment, Banta must prove that the termination of her employment resulted from intentional discrimination.  She argues this is a limited burden because she does not have to prove "retaliation was the sole or even a primary reason for the discharge – she must simply prove that it was a factor."  Doc. No. 48-15, p. 19.  This is a misstatement of the law.[7]  In *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144 (8th Cir. 2008), the Eighth Circuit held:

> Although [the plaintiff] admits that [the employer] had additional reasons for discharging her, she strenuously contends that she needed to show only that her reports were a 'motivating factor' in his decision, as that term is defined in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241-42, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989).  We have held, however, that the *Price Waterhouse* standard does not apply to retaliation claims: To make out a retaliation claim, the plaintiff must show that the protected conduct was a 'determinative-not merely motivating-factor' in the employer's adverse employment decision.  *Carrington* [*v. City of Des Moines, Iowa*], 481 F.3d [1046,] 1053 [(8th Cir. 2007)].

*Van Horn*, 526 F.3d at 1148.  Thus, Banta ultimately must show that her complaint about a racially hostile work environment was a determinative factor in the defendants' decision to terminate her employment.

---

[7]Banta withdrew this contention during oral argument.

Banta does not dispute that she refused a direct order from the restaurant manager to perform a menu presentation, *see* Doc. No. 48-15, p. 19, but she argues this was not the reason for the termination of her employment. After reviewing Banta's own description of the events surrounding her termination, discussed *supra*, the court finds that the record does not support this argument. It is obvious that the determinative factor in the defendants' decision to terminate Banta's employment was her repeated refusal to perform a menu presentation as ordered by the restaurant manager, and not any other reason.

Brown told Banta to perform a menu presentation on January 28, 2006, and she refused. Brown then told her she would be required to perform the presentation before her next shift. When Banta came into work on January 29, 2006, Brown told her to perform the presentation, and she refused again. Brown did not terminate her employment then, but told her that her continued refusal would, in effect, mean she was quitting her job. Banta responded, "if [you want] to fire me over this issue[,] go ahead." Pl. App. at 111. Brown only fired her after she *again* refused to perform the menu presentation at the end of her shift. Banta was given several chances to comply with the order that she perform a menu presentation, and her employment was terminated only after she consistently refused to obey that order.

Banta points to the following evidence to support her argument that this was a pretext: (1) Brown, the restaurant manager, seldom spoke with her after she complained of the hostile work environment; (2) on three specific occasions, she was subjected to direct retaliation;[8] (3) she reviewed the personnel files of various Outback employees, and they contained no mention of complaints she knows were made against them, while her

---

[8]As described above, Banta cites three specific instances of claimed retaliation: the criticism she received for the way she put ice into glasses, being asked to move her car from the customer parking area, and the food ticket incident.

own personnel file contains "copious notes" regarding numerous matters; and (4) the temporal proximity between her complaints and her discharge.

None of this evidence supports a claim that the defendants' proffered reason for terminating Banta's employment was a pretext. The claim that Brown seldom spoke with Banta after she complained of discrimination is not evidence that the stated reason for her termination was a pretext, or that her termination was a result of intentional racial discrimination. The three instances of claimed direct "retaliation" border on the frivolous. They all involved minor issues between Banta and her supervisor that were resolved expeditiously, and none of them resulted in any adverse consequence. The fact that her personnel file looks different from the personnel files of others is not evidence of a pretextual termination. Beginning with the Christmas Eve incident, Banta was increasingly critical of management. She also was documenting her disputes with emails and written statements, and asking that witnesses be present for meetings with management. In this circumstance, it was prudent for management also to document issues that arose between Banta and management. Nothing in the record suggests that the documentation in Banta's personnel file led to any adverse action against her or had anything to do with the termination of her employment.

On the question of temporal proximity, both sides cite *Hervey v. County of Koochiching*, 527 F.3d 711 (8th Cir. 2008). The defendants point out that in *Hervey*, the court held, "Generally . . . 'more than a temporal connection between the protected conduct and the adverse employment action is required to create a genuine factual issue on retaliation.'" *Id.*, 527 F.3d at 723 (quoting *Kiel v. Select Arificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). Banta responds that in *Hervey*, the employee's insubordination (the non-discriminatory reason advanced by the employer for its adverse action) began before the complaint of discrimination.

Banta's employment was terminated about a month after her first written complaint. The court finds that any temporal proximity between Banta's complaints and the termination of her employment is weak, especially in light of the other strong evidence that her termination was for a reason other than her complaints. In her own statement describing the events surrounding her termination, Banta makes no mention of any relationship between her termination and the complaints she had made about a racially hostile work environment. As Banta says in her brief, her conduct on January 28-29, 2006, was "essentially an act of 'civil disobedience.'" Doc. No. 48-15 at 24. Banta's "disobedience" in refusing to perform a requirement of her job was the reason for the termination of her employment, whether it was "civil" or not.

Virtually nothing in the record connects the termination of Banta's employment to any racial or retaliatory motive. At the time of the termination, the complaints of a racially hostile work environment had been resolved, and the offending co-employee had been terminated. In a completely unrelated circumstance, her manager asked Banta to perform a reasonable job function, and she refused. He gave her two more opportunities to perform the function, and she refused each time. Before the third time, he told her she would lose her job if she refused again, and she responded that if he wanted to fire her, he should go ahead. When she refused a third time, he terminated her employment. Nothing in this sequence of events, or in this record, suggests that the "determinative factor" in the defendants' decision to terminate Banta's employment to retaliate against her for complaining about a racially hostile work environment.

The defendants' motion for summary judgment on this claim is **granted**.


## C. Banta's Claim for Punitive Damages

The defendants ask for summary judgment on the plaintiff's claim for punitive damages. Based on the record now before the court, it is unlikely that the claim for

punitive damages will be submitted to the jury. However, this question will best be resolved after all of the evidence is presented to the jury. The defendants' motion for summary judgment on this claim is **denied**.

## IV. CONCLUSION

Based upon the foregoing analysis, the defendants' motion for summary judgment (Doc. No. 17) is **granted in part and denied in part**. The motion is **granted** on Banta's retaliatory discharge claim, and **denied** on all other grounds.

**IT IS SO ORDERED.**

**DATED** this 1st day of December, 2008.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT